You may proceed. Good morning, Your Honors. Susan Alexander for the plaintiffs. With me at counsel's table is Andy Love. Excuse me. The district court in this case found a RICO enterprise was alleged. Specifically, the court found plaintiffs have adequately alleged that defendants, all of the defendants, acted for the common purpose of defrauding investors into purchasing the triple net properties with allegedly inflated prices. The court also found the plaintiffs have sufficiently alleged that the conduct of the enterprise as a whole was ongoing, in that the transactions at issue occurred over several years. And to the extent that the ongoing conduct is required to use similar methods, the court found that enough of the alleged transactions follow the same general sequence to satisfy that requirement. The court found many of the elements of a full RICO claim as to many of the defendants. The one element that the court did not find was intent, which is a portion of predicate acts. And this court, in the Sons Savings and Loan decision, held that intention is shown by examining the scheme itself. And I think that the easiest way to do that is with the chart that I've provided for the court, which merely accumulates facts that are in the complaint and in the record. At the top of the chart is Marcus and Millichap. Marcus and Millichap provided the capital for this enterprise. Without Marcus and Millichap, there is no money and there is no enterprise. They provided the capital. Kennedy, what you're going to show us now, I take it, is proof of intent. Yes. And your proposition would be that this that you're going to present would exclude all other reasons that might be other than their criminal intent. No. This is no. In a civil RICO case, we are at the pleading stage. We're only required to show you that the intent is plausible. And intent, actually, of the many elements of a RICO claim is pled with a Rule 8 notice standard, not even under 9b particularity. So we're looking at a Rule 8 notice standard on a plausibility basis under ICFAL. Okay. With respect to intent. So what ICFAL says is that the claim is plausible if the factual content leads to a reasonable inference of liability. So I'm trying to establish a plausible. Suppose there are two inferences that are equally plausible. What happens then? Ties go to the plaintiffs. And the case that says that is this Court's decision in Starr in 2011. Ties go to the plaintiff at the pleading stage. This Court's decision in Century of last year said that where defendants – there was something about defendants' explanation that made plaintiffs' explanation implausible, then defendants' explanation might prevail, but where there are two plausible explanations at the pleading stage, plaintiffs prevail. And plaintiffs are entitled to go forward and get discovery, which we haven't even had in this case. The – if I may, I think it's helpful to go through the scheme. Go ahead. Okay. Marcus and Millichap provides all the money. They provide the capital to Sovereign Investment, which is alleged to be an alter ego of Marcus and Millichap, and I'll get to the alter ego allegations in a moment. Sovereign provides the financing to Morabito and its entities and Walti and its entities. This case, for bankruptcy and other reasons, this case is stayed as to the Walti entities, so I will only be focusing on the Morabito entities. So with Sovereign's financing from Marcus and Millichap's capital, Morabito and its entities purchase 14 properties with the 14 Jiffy Lube franchises on them, and then begins the loop. So the Morabito entities sell the properties back to Sovereign and put a 15 to 25-year lease on the property at an artificially inflated rate. In most instances, the rate was 50 percent above a commercially reasonable rate, what we have alleged is the fair market value arm's length rate. With those 15 to 25-year leases on them, the property value itself was inflated because commercial properties are valued based on the income stream from the lease, as I'm sure Your Honors understand. And so the lease back had the direct and intended effect of at least doubling the apparent property values. The property then, Marcus and Millichap directed Marcus and Millichap Real Estate Investment Services and Marcus and Millichap Brokers to market those properties to plaintiffs. And we know from the June 16, 2004 Commercial Property News article that all of this was the plan from the beginning. So Sovereign, the CEO and president of Sovereign, explained in that article that the reason that they were they could offer more money, this is a quote, could offer more money than a conventional lender in providing the financing to Morabito because it, Sovereign, an alter ego of Marcus and Millichap, was confident in an exit strategy since the brokerage firm, Marcus and Millichap Brokers, could sell the assets to private investors. That's at paragraph 22 of the complaint. And it's a quote from the Sovereign CEO. So they had this plan, and they offered it to, they marketed it to plaintiffs by saying that plan in and of itself has any nefarious effect. It does. It does. Because there is, in fact, no legitimate reason for inflating the rental. But the statement itself, that's a legitimate business approach. Well, right. Okay. You're not complaining about the process or the legitimate business scheme. It's just the evaluations. The point of the statement is to show the interconnectedness of Marcus and Millichap Sovereign, Marcus and Millichap Real Estate Investment Services, and Marcus and Millichap Brokers. This was an association, in fact, enterprise, as we'll get to in the alter ego allegations. It's really they're all interconnected. But that was the point, is to show the interconnectedness. Let me ask you a question. You say that to determine intent, we should look at the or examine the scheme itself. Yes. And one of your complaints is that the trial judge took little bits and pieces of different properties and said, well, for example, in the Armeta property, not only did they not make money, but they lost a substantial amount of money, the scheme, right? Right. And on several others, they either made no money or lost money, right? Or very little. Well, overall. Overall. Okay. Yes. Your complaint was that the judge cherry-picked certain properties and said, well, in this case, they lost, not gained anything, but they lost almost 40 percent of their investment. In this one, they only made maybe 1 percent on their investment. That was your one of your complaints, right? You want us to look at so you say look at the scheme overall. That's one of our concerns, yes. Okay. In order to do that, do you rely on the alleged true value that you say was the real value of the property based on fair market value leases that were evaluated by independent appraisers after the fact? Yes. All right. Explain to me how, and I'll use Armeta as an example. The price that your client paid was $635,000. The scheme, as a whole, paid over a million dollars for it. Not only did they pay two and a half years of rent at what you say are grossly inflated rental rates, but they lost approximately $400,000. Okay. Now, that's your one of your complaints is you shouldn't pick out that one. But if you look at the overall totals, you say that the court should look at the alleged true value based on your appraisals of $11 million. Yes. But when the people who are involved in this, the defendants, the conspirators, they actually paid almost twice that. I'm so glad that you brought that up. For the property. I'm sorry. Okay. So they're investing $10 million or $9 million more than you give them credit for investing. No. And there are two reasons why. I'm really glad you brought it up. You're talking about the chart on pages 10 and 11 of Defendant's Brief that says that they paid $20 million, and there are two problems with it. Number one, what they've done is they have totaled the number that's at the top of each of those individual charts that shows the price that Morabito or Walti or one of the entities paid. And those numbers have a big asterisk next to them for one reason, which is all of the properties, the 22 involved in this case and the seven other properties that are not part of this case were purchased as bulk transactions in units of four, six more. And the defendants, these defendants, randomly assigned values to different properties. So without discovery, we don't know what they paid. For example, if the Court looks at ER-126. Are you saying that these 22 properties are part of 50 properties or whatever that number might be? They're part of 27, and the individual purchase prices were randomly assigned by defendants. So, for example, at ER-126, one of the properties was assigned a value of $1. So we don't know specifically what the property values were. The second reason that those numbers, the $20 million number, is absolutely misleading is that was the purchase price for the property and the franchise business. Didn't you accept these numbers in making argument, the $20 million is the actual purchase price? No. No. Because that was a number for the purchase of the properties and the franchise business. What they sold back to Sovereign and what they ultimately sold to plaintiffs was the property. So it's comparing apples and oranges, property with a lease on it. I'm looking at the column that says admittedly fair market price paid by the tenants, which are the conspirators, a little over $20 million. Are you saying that's not admitted? It's the fair market value for the property. So you're saying it's not admittedly the fair market price. I'm saying it is admittedly the fair market price for two, but it's misleading for two reasons. It includes the value of the franchises as well as the properties. It's a combined number. Okay. So that's different than what you just said, which was that there would be bulk sales included properties other than these 22. So I'm not going to have a difficult time. There are two reasons. I'm having a difficult time following. I'm sorry. Let me try and be more clear. There are two reasons that the number is misleading. One reason is because it also includes the franchises. It's a property. Their purchase price was of the property and the franchise. The other reason that it's misleading is because these properties were purchased in bulk with the values. Okay. The building, the real estate, and the Jiffy Lube franchise. Yeah. Okay. Yes. All right. Yes. The so the difference between the fair we allege at paragraph 26 that the fair market value was $11.1 million and they were sold to plaintiffs for $30 million. Additionally, all 22 of the leases were abandoned with $60 million worth of rent still owing. And paragraph 25 alleges that was the plan from the beginning. These tenants had no ability and no intention to fulfill the lease terms. Let me ask you a question. Let me go back. I hate to keep going back to harp on this, but if the purchase price involved the real estate plus the Jiffy Lube and some of them and the church chicken franchises, did you argue that in opposition to the motion to dismiss? Did you argue to bring that to the judge's attention? I'm sorry. Bring to the judge's attention? The fact that these admittedly fair market price paid by tenants was not only for the property, the real estate, but also for the value of the franchise, whatever that might be. Did you present that to? It's certainly in the complaint. Did you present that to the judge? Right. And I don't believe that that specific question came up in the argument before the district court. Okay. I have two and a half minutes remaining. There are significant alter ego allegations here regarding commingled assets. Disregarded corporate formalities. Marcus & Millichap owns 100 percent of the stock of both Marcus & Millichap Real Estate Investment and Sovereign Investment. They share the same company headquarters, employees, HR department. They share payroll. And the settlement statements that plaintiffs received at the closing of the transaction stated that Marcus & Millichap received the sales commissions. I'd like to reserve the rest of my time for rebuttal, if I may. You can reserve the time, but I want to ask you a question. Okay. Thank you. We'll give you the time. Thank you, Your Honor. I asked you a question initially about suppose there is another equally valid reason like the market going down, which is argued by your opposition, that everybody was taking a bath because of what happened to the market. And I wanted to call your attention to a case that you've undoubtedly read, but it came from our circuit, which makes it important to us because we have to follow it. And that's Henry Century, Ill. In that case, it refers to, at page 1108, it refers to when there are two possible explanations. Now, you indicated that pleading, that doesn't count. But as I understand it, this was a pleading case. And they cited, our court cited Iqbal, and then found on opposite the way you are indicating. What do we do with that case? Judge Watford's case. Right. Judge Watford's case, which I've read closely. I believe it was his first reading. I'm sure you did. That's why I asked you. Yes. So what Century says, it does not change this Court's law established in Starr two years earlier. What Century says is that in that particular case, defendant's explanation made plaintiff's explanation unreasonable and, therefore, implausible. And, therefore, there were not two plausible explanations. There was only one plausible explanation. That's very different than the situation here. First of all here, defendant's explanation is not grounded in the complaint. It is grounded in documents that they tried to offer to the district court, tried to get judicial notice for in the district court, and the district court rejected that, said it would turn this case into a summary judgment, and said those documents could not be admitted. They've dropped it in a footnote here and given you six volumes of supplemental excerpts of record of documents that were never admitted in the district court. So there is no factual grounding for defendant's inference in the first place, and it certainly is not enough to make our inference implausible. And that's what Century says. Century does not change the law that where there are two plausible inferences, the tie goes to the plaintiff. Century merely – because I did read it closely because I was concerned. But in Century, defendant's inference made plaintiff's inference unreasonable, and that was the reason that the court accepted defendant's inference. So here, what they're going to argue, and you might as well get your answer now. Here they're going to say it was not only the bath that came with the depression of the economy, but in addition they stayed a long time. They paid millions of dollars of rent. And if it was just a get and go, they would have gone earlier. So they're saying that's not logical. That's not – they wouldn't – they wouldn't sacrifice millions of dollars in rent. As soon as a deal was done, they would get out. Well, first of all, overall, they paid $8 million in rent. They'd already made $20 million on the sale of the property, and they walked away from $60 million of ongoing rent. But I think more to the point, that argument, which I think you're right, defendants will likely make, just reflects that the scheme didn't work as well as they had hoped, which is not a reason to suggest that there wasn't fraudulent intent from the get-go. In paragraph 25 of the complaint, we have alleged there was never any intention or ability on behalf of these plaintiffs to be able to honor these leases. Okay. We'll save your rebuttal time. Thank you. Thank you, Your Honor. Good morning, Your Honor. May it please the Court, Dan Purcell of Kecker and Van Nest for Defendants and FLEs, Marcus and Millichap Company, Sovereign Investment, and the Sovereign Subsidiaries. I think the issue has been very well joined by Your Honor's questions and by Plaintiffs' counsel's presentation. The place I'd like to start is that this is not the usual case where a complaint was dismissed because there weren't enough factual allegations in it. There are some places in the complaint where the factual allegations aren't present, where there are just conclusions. But this is a case where the allegations in the complaint, the actual facts presented, disprove the theory of liability. And Your Honor is right, Judge Wallace is right, the Century Aluminum is the governing case in the Ninth Circuit. It's the most recent statement by the circuit on the Iqbal-Twombly standard. And I can read from Century Aluminum, and I disagree very fundamentally with Plaintiffs' counsel's interpretation of it. What the Court said, this is 729F3, 1104 is the site of the case. I actually don't have the pin site here, unfortunately. But the Court wrote, when faced with two possible explanations, only one of which can be true, and only one of which results in liability, plaintiffs cannot offer allegations that are merely consistent with their favored explanation, but are also consistent with the alternative explanation. Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true. So it's not the case that the tie goes to the plaintiff under Century. It's the case where there's a tie. The plaintiff has the burden to offer facts that tend to exclude the lawful explanation for the conduct and are consistent, more consistent with an unlawful explanation. And that's exactly what they haven't done here. And that comes right out of Twombly. It's not just the Ninth Circuit that's reached this conclusion. 550 U.S. at 554 in Twombly, conduct that is, quote, just as much in line, unquote, with a lawful explanation as an unlawful one, is not enough to support liability. And here, frankly, we don't even get to that standard. They're not even really within shouting distance of it, because there aren't competing plausible narratives. As the district court found correctly, their narrative is implausible. And these aren't inferences drawn by the district court. These aren't resolution of factual disputes or findings. These are just the facts that are stated in the complaint. And what the complaint says is that these properties were purchased in late 2003 to late 2004 for $20 million from third parties, not members of the conspiracy. They're admittedly fair market prices. This argument about, oh, well, the franchise was included, I don't think that's alleged in the complaint squarely. It was certainly never argued below. I don't believe that it's anywhere in their opposition to the motion to dismiss or in the transcript. But after the properties were purchased for $20 million, these long-term, 15- to 25-year leases were added. Plaintiffs say in their complaint, again, that the addition of these long-term leases increases the value of the property by multiples. Here, it was only 50 percent. They were half again as valuable once the leases were added, because the properties were sold for $30 million. And again, this isn't, you know, cutting and pasting and apportioning value among the properties, this is an aggregation of all 22 of the properties for $30 million. So you have a $10 million profit that the conspiracy, the supposed conspiracy received. And what happened after that? Well, their theory is they just wanted to take that money and then abandon the properties and go off with their ill-gotten gains, but they didn't do that. They stayed and they operated the properties for three to four years. They paid $8 million, $8.2 million, actually, in rent to the plaintiffs. So that's 82 percent of the money that they had gotten from the sales right there, 82 percent of the supposed profit. They put in a tremendous amount of hard work operating chicken franchises, oil change franchises. They paid the expenses associated with those businesses, the taxes, the insurance, the upkeep. So you have $1.8 million less expenses split among 32 supposed conspirators over a four-year period, which works out to around $15,000 a year per conspirator for this massive criminal conspiracy. It's not a plausible conspiracy. And so we point this out in our opposition. What do plaintiffs come back with in reply? What they say is, well, the defendants had to wait until all the properties were sold in order to start abandoning the leases, because they had to lure everybody in first. Well, that's not true either, if you look at their complaint. All but one property, 21 of the 22, were sold by January of 2006, and there was one straggling property sold in June of 2006. There was one lease breach in March of 2007, so nine months after the last property was sold. Kennedy, is this all in the complaint? This is all in the complaint. Let me ask you a question. It refers back to our earlier case of Starr. Clearly, either side has something that's plausible that they're arguing. But if I understand Starr correctly, and this was indicated again in our Century II case, that there has to be a demonstration that there's only one that's probable. The other one can't be. It can't be logical. Now, where in the complaint, where in the complaint isn't theirs as logical an outline of what happened as yours? Well, this is sort of what I've been saying, Your Honor. The scheme that they're alleging isn't plausible because it did not work as they say it did. They say that these people lured in investors and then abandoned the leases willy-nilly and wanted to take a bunch of money, the proceeds from that. That's not what happened. The more plausible explanation by far is that these were legitimate businesses trying to make it work. They couldn't make it work. It doesn't really matter why, but they ended up paying the vast majority, if not more than, the proceeds of the supposed conspiracy, working these businesses in good faith for three to four years, millions of dollars in rent, to the plaintiffs before they ended up walking away from the leases. They may have a claim for breach of contract on the leases, but it's not a RICO claim. It's not a plausible conspiracy involving these 32 people, these brokers, these financing companies, and everybody else, when there was no – there were no proceeds. So you're saying that it's not a possible analysis of what took place? I'm saying it's not plausible. I mean, it is conceivable that it could have happened, but Starr says that's not enough. If both are plausible, I think you lose, don't you? Doesn't it have to go on to discovery? No. If both are plausible under Century Aluminum and only one can be true, then plaintiffs have to offer some evidence tending to exclude. If only one can be true. Right. And in this case, only one can be true. Either there was fraudulent intent or there wasn't. You can't have both. Well, the way the analysis goes in Starr is if one is plausible and the other was only possible. They make that distinction. Right. And that is, I think, what we have here. You have the plausible fact that these people paid a lot of money for these businesses, got a little bit more back, then worked the businesses, paid out all of their gains, and worked the businesses for three to four years, and then not all at once, but over a period of time, as the businesses failed, walked away from the leases. That is plausible. Your adversary is going to come up and argue, says, no, no, no, this is just what they planned to do. Look, they got 8 million bucks. They sacrificed that. But that was the plan all the time, that they were just going to keep them for a while and dump them. Can we say that it becomes, it's no longer plausible, but only possible because these people hang on for a while, figuring they may make more money? Well, I don't know that there's any allegation that they figured they would have made more money or that there was any indication they could have made more money. I think at some point, the conduct becomes so, well, I mean, implausible, that it doesn't satisfy Starr. It doesn't satisfy Century. When you're talking about a conspiracy, an alleged conspiracy that so obviously didn't work, and there's no indication for three to four years that there's any intention She's just going to say you're just bad conspirators. I understand that's their position, but at some point, a bad conspiracy can't support an inference of conspiracy. Yeah. I'm having problems just trying to define what we've talked about before, where it becomes plausible to possible. And as I understand, what we've said is that when it becomes only possible, then you have an alleged enough. Right. And that's what the district court concluded. Based upon the analysis the district court made. But these words are a little difficult to apply to a situation as complex as the one that's before us. But if I understand your argument correctly, that although they worked out a deal in which they made a good hunk of change, that they spent another $8 million indicates that it's not plausible, that it would be other than as you analyze it, where you say that what they analyze, how they analyze, is only a possibility because of that. Isn't the key to yours that they hung on to it for a period of time and paid $8 million back? I think that is the key. And that's what I've been trying to emphasize. And it's not just the $8 million. It's also the time. So you have all but one of the properties sold by January of 2006. And other than one early abandonment, the lease abandonments start in earnest in August of 2007. So that's a year and a half later. And your argument is that's when the bottom went out of the market? Well, I mean, it may be that the bottom went out of the market then. It may be that the businesses failed for other reasons. Businesses fail all the time for reasons that have nothing to do with fraud. And I don't think this Court, the district court, anyone needs to make a determination or could make a determination of that at the pleading stage. The point is that it's completely inconsistent with this idea that, oh, we're going to sell all these properties and then pull the rug out from under the plaintiffs. I mean, they pulled the rug strand by strand. I mean, there was no yanking of the rug from underneath the plaintiffs. And to get back to Century and Starr, because I know that's an important thing that this Court is going to have to grapple with in writing its opinion, you're right about Starr. I mean, Starr says, and it's clear in the Ninth Circuit, that where you have a plausible explanation and one that's merely possible, that's not good enough. Starr did say that when you have two plausible explanations, then that's probably good enough. Century is a bit in tension with that and said, no, the plaintiff needs to offer more, needs to offer evidence tending to exclude the lawful plausible explanation. And that's the most recent statement from the Court. But, again, here we would say that whichever standard you apply, plaintiffs haven't met it, because we do have a plausible explanation based on the pleaded facts in the complaint, the actual behavior of the defendants that show that this was just a business deal that didn't happen to work out. Whereas, then they have this implausible explanation that I suppose is possible that there was this grand scheme to defraud. And, I mean, in terms of how the scheme supposedly worked, there's no connection in the record between Morabito and Welty, no indication they worked together. The Welty properties were acquired in November of 2004 by the supposed conspiracy. By that time, most of the Morabito properties had already been sold to plaintiffs. So there's a lot about this conspiracy that doesn't hang together. And as Judge Huck mentioned, when you examine it on a transaction-by-transaction basis, it's even more implausible because you have situations like the Linden transaction, the Armenta transaction. This is at pages 20 to 22 of our brief with record citations where the supposed conspiracy really took a bath. I would like to mention the alter ego question, because that is pretty important to my client, the Marcus & Millichap Company. In their brief, they do a lot to, you know, use this umbrella term M&M and really conflate Marcus & Millichap with its subsidiaries. The district court was right. There is not a single factual allegation about the Marcus & Millichap Company other than it's a parent of these other entities and it provided financing to them. Providing financing is not enough to pierce the corporate veil. That's clear as day. There's an allegation that people were unclear in their marketing materials as to which Marcus & Millichap entity was being dealt with under this Court's decision in Islamic Republic v. Gould. It's 969. F second, 764. That's not enough either. There, there were actual misrepresentations. Here, there might have been some sloppiness, but that's not good enough to pierce the corporate veil. And again, the Katzer's Floor case, which is 394, F third, 1143, talks about disregard of corporate formalities. There's none of that, always a separate entity. There's no commingling. There's nothing in the complaint that indicates Marcus & Millichap got anything from these, these transactions and there's no undercapitalization. They make a big deal about a fraud allegation, but Katzer's Floor says the fraud has to actually have to do with abuse of the corporate form. And there's no indication of any sort of fraud having to do with the corporate form here. And I'd also like to put in a word for, you know, the individual brokers you have here, many different individuals, six of whom participated in one transaction. That can't possibly satisfy the pattern requirement. Two others participated in a small number of transactions over a six to nine month period, and the same is true, the pattern requirement can't be satisfied as to them. Thank you. Thank you. The standard is plausibility. And we have satisfied Iqbal and Starr by pleading a plausible claim. The defendants spent $8 million in rent. I mean, if you look at it in the bulk numbers, they spent $8 million in rent to make $20 million in inflated property sales. So they spent 8 to make 20. It's plausible. The problem with the opposing inference, there are two problems. They have two explanations. One is it didn't work very well, and the other is it was the economy. It didn't work very well doesn't make it implausible. It doesn't mean it was an implausible scheme. It means it didn't work as well as they would have liked. We alleged in paragraph 108 that part of the scheme was to hang on to these properties and abandon them slowly, but all 22 properties were abandoned. There must be a reasonable inference drawn from a 100% abandonment rate. In disparate parts of the country, all of these leases were abandoned. Their second explanation is it's the economy, but there is no grounding in the complaint. There is nothing for them to rely on for that inference. So it's a baseless inference, which cannot make our inference implausible. The fact is, we all know that the economy, you know, there were economic issues. That may have also been going on. That doesn't make our explanation implausible. And where our explanation is plausible, we are entitled to the tie at the pleading stage. Yes, I'm sorry. Roberts, I don't want to be stuck on one issue, but did you go back and see in the complaint whether you disputed the agreed-upon purchase price by the conspirators or whether it was argued to the district court? Is there someplace in the record where that was actually argued to the court or actually alleged in the complaint? I'm sorry, which price, the original purchase price? No, what I refer to is referred to in the papers as the agreed-upon actual price that was paid by the conspirators when they purchased the property. Those prices are alleged in the complaint. So we have alleged them, but we allege them with an asterisk next to them that said they were part of a bulk transaction and the values were randomly assigned by defendants, including in some situations assigning a $1 value to a property. That's what I thought it was. But where is the part about the Jiffy Lube and the church chicken franchises? Is that part of the asterisk? No, that's in the more general explanation of the fraud itself. If you look at the introduction, paragraphs 1 through 25, and you look at the – there's a portion of the complaint. What paragraph is that? Do you know? No, I'll look for it later. The reason I'm concerned about that is because we're talking about plausible, possible. And if these numbers – okay, go ahead. Thank you. I'm sorry. Paragraph 2 of the complaint says that defendants first approached non-party operators of commercial rental properties containing existing Quick Lube and fast food franchises and offered to purchase the real estate and the franchise businesses. Okay. So they purchased the real estate and the franchise businesses. What they sold – that's paragraph 2. What they sold to Sovereign was the property. And I want to be clear about something else. In paragraph – Wait, wait, wait. Sure. Is that included in the agreed-upon price? The price – yes. The price that they paid, we allege the price they paid was for the real estate and the franchise business. What they sold to Sovereign was the real estate with a lease on it. So I want to be clear that our allegation in paragraph 26 that says the fair market value of these properties with $11.1 million assumes a 15- to 25-year lease. So we are comparing the same thing. Thank you very much, Your Honors. Thank you. I want to especially thank counsel for this argument. This is a very complicated case, and I think we were assisted, no matter how we come out, by competent counsel coming well-prepared to make competent, clear presentations and answer our questions directly. It was a model of the type of an exercise that we appreciate. Thank you very much for your work. No matter whether you win or lose, you were of service to the Court. On that last opinion, there will be no dissent, I'm fairly confident. Okay. The case just argued electric properties will be submitted for decision.
judges: Huck, Wallace, Gould